UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ADVANTUS, CORP.
and OT LIGHTING BUYER, LLC,

CASE NO.:  3:23-cv-1393

　　　Plaintiffs,

v.

MICHAEL EGAN,

　　　Defendant.

_____/

## TIME SENSITIVE MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs, Advantus, Corp. ("Advantus") and OT Lighting Buyer, LLC, pursuant to Federal Rule of Civil Procedure 65 and Local Rules 6.01 and 6.02, move for the entry of a temporary restraining order and preliminary injunction against Defendant, Michael Egan ("Egan"), and in support, state as follows:

### I. INTRODUCTION

Egan, a former employee of OttLite Technologies, LLC ("OttLite, Inc."), from whom recently Advantus acquired certain assets, is making extortionist threats to reveal Advantus' trade secrets to a significant customer if Egan's monetary demands are not met by December 4, 2023. If Egan discloses Advantus' pricing and factory information on December 4, 2023 as he has explicitly

threatened to do in writing, he will inflict severe and irreparable harm on Advantus and its customer relationships. In accord with Local Rule 3.01(e), Advantus therefore respectfully requests a ruling by December 1, 2023.

Egan presently holds a default final judgment against OttLite, Inc. and Advantus does not seek in any way to preclude Egan's pursuit of any legal remedies he may have to collect that judgment from OttLite, Inc. or any other person or entity who may have liability for that judgment. Instead, this is a case about Egan's threatened disclosure of certain trade secrets Advantus now owns and threatened tortious interference with Advantus' advantageous business relationships. On November 22, 2023 (the day before Thanksgiving), Egan explicitly threatened to disclose Advantus' pricing information for products Egan previously sold to certain OttLite, Inc. customers, to include disclosing the capabilities and pricing of the factory OttLite, Inc. has been using to manufacture the products for a major retail customer of OttLite, Inc (now Advantus). Advantus recently acquired these product lines and confidential pricing and factory information from OttLite, Inc. The disclosure of this information will cause significant and immediate irreparable damage to Advantus, and Egan is explicitly using the threat of disclosure of this confidential information for the sole purpose of trying to leverage payment for the bonus money he claims OttLite, Inc. owes him.

Advantus seeks very narrow injunctive relief to preserve the status quo, and by use of a temporary restraining order and/or preliminary injunction, prevent Egan from carrying out his direct threats to disclose Advantus' trade secrets to its customers as once that disclosure is made, the damage cannot be undone.

## II. CERTIFICATION OF COMPLIANCE WITH FEDERAL RULE OF PROCEDURE 65 AND LOCAL RULES 6.01 AND 6.02

The facts supporting this Motion are set forth in two Declarations Advantus filed with its Complaint. Those Declarations collectively support the allegations of Advantus' Complaint. Advantus did not verify the Complaint itself as no one person has knowledge of all of the facts in the Complaint. The Declarations redact the names of the affected customers and the confidential pricing and factory information to avoid disclosure of these secrets in the public record. Advantus has contemporaneously filed a motion to file unredacted versions of the Declarations and exhibits under seal.

Advantus' undersigned counsel certifies that they have not provided advance notice of this Motion to Egan, because Egan has threatened further disclosure of Advantus' trade secrets by email to Advantus' customers if his demands are not met by December 4, 2023. Therefore, all Egan needs to do to cause the irreparable harm he threatens is to hit send on an email that he has already submitted in draft to employees of Advantus. If Egan hits "send" on that email before this Court restrains him, the damage is done and the status quo can no

longer be preserved. Providing Egan with prior notice of this Motion and lawsuit would therefore allow him in a matter of moments to cause the very harm Advantus seeks to prevent.

Further, a temporary restraining order and/or preliminary injunction preventing Egan from disclosing the information he has threatened to disclose will not cause Egan harm. He receives no benefit from its disclosure; its disclosure only harms Advantus and this is the very reason he has explicitly threatened to harm Advantus if his demands are not met. Further, Egan's contract with his former employer, OttLite., Inc., already required him to keep this information confidential. Conversely, the mere disclosure of this information substantially risks Advantus losing longstanding, multi-million-dollar business relationships with anticipated annual revenues in the tens of millions of dollars.

Advantus requests that this Court restrain Egan from directly or indirectly using or disclosing any of the OttLite, Inc. pricing or factory information as more particularly set forth herein and in the supporting Declarations. In section 7, *infra*, Advantus addresses the needed security.

### III. FACTUAL BACKGROUND

**A.    Advantus Acquires Certain of OttLite, Inc.'s Assets, Including Customer Relationships and Confidential Pricing and Factory Information**

On October 25, 2023, Advantus, through its wholly owned subsidiary, OT Lighting Buyer, LLC, acquired certain of OttLite, Inc.'s assets. *See* Declaration of

4

Kevin Carpenter ("Carpenter") ¶ 6. These assets included OttLite, Inc.'s ongoing customer relationships and the confidential and proprietary information and data relating to those customer relationships, including OttLite, Inc.'s confidential and proprietary customer pricing and program information, including price lists, sales histories, and price quotes, (the "Pricing Information"), and OttLite's confidential and proprietary information regarding the factory capabilities and unit pricing OttLite, Inc. used for manufacturing products (the "Factory Information"). Carpenter ¶ 6. OttLite developed the Pricing and Factory Information over many years through its business relationships with its various customers and factories. Carpenter. Declaration of Doug May ("May") at ¶ 10.

The Pricing Information Advantus acquired is unique to each customer and derives significant, independent economic value because, among other things, any pricing variations among various customers are not shared publicly or among customers, nor is it shared with competitors. Carpenter ¶ 9; May ¶ 9. The Factory Information also derives significant, independent economic value because, among other things, it is not shared with Advantus' customers or competitors. Carpenter ¶ 10; May ¶ 8. That is Advantus' customers do not know what each other might pay per unit and do not know what Advantus' factory costs are for each unit.

**B.    OttLite, Inc. Provided Egan Limited Access to the Confidential Pricing and Factory Information**

For approximately four years prior to Advantus' purchase of certain of OttLite's assets in October of 2023, Egan acted as a National Account Manager for OttLite, Inc. May Dec. at ¶ 13. During this time, OttLite, Inc. provided Egan limited access to its Pricing and Factory Information only for the particular product lines and particular customers Egan serviced, and only for the purpose of negotiating sales to the particular customers to which the Pricing and Factory Information applied. May at ¶ 15. At all times, OttLite, Inc. intended to and did keep its Pricing and Factory Information confidential and did not share it publicly, with competitors, or among customers. May ¶ 8. Advantus similarly keeps this information secret and limits access to it. Carpenter ¶ 11.

OttLite, Inc. undertook efforts and expense to derive its pricing for its various customers and for the factories who manufactured the products, which was developed through intense and extensive negotiations with its customers and factories over many years, including the four years OttLite employed Egan. May ¶ 10. OttLite also undertook reasonable efforts to keep its Pricing and Factory Information confidential. May ¶ 8. OttLite, Inc. shared the Pricing and Factory Information with Egan so that he could carry out his duties as a National Account Manager and because it expected that he would honor his obligations  to use the

Pricing or Factory Information only for servicing OttLite, Inc.'s customers on OttLite, Inc.'s behalf. May ¶ 15.

## C.   Egan Makes Extortionist Threats

On September 22, 2023, OttLite terminated Egan's employment. May ¶ 19. OttLite, Inc. requested that Egan return his company-issued laptop, which contains various confidential and trade secret information, including the Pricing and Factory Information, but Egan refused. May ¶ 21. Shortly thereafter, on or about September 26, 2023 (prior to Advantus acquiring certain of OttLite, Inc.'s assets), Egan filed a lawsuit against OttLite, Inc. in the Hillsborough County Court claiming that OttLite, Inc. failed to pay him $18,000 in bonus money. Egan ultimately obtained a default final judgment against OttLite, Inc. May ¶ 22, Exh. 2. Instead of pursuing the legal remedies available to him to collect this judgment, Egan now threatens to disclose trade secrets Advantus now owns if Egan's demands are not met. Carpenter ¶¶ 18, 20.

On the afternoon of November 22, 2023, the day before Thanksgiving, Egan emailed two prior members of OttLite, Inc.'s senior management, Doug May and Anders Forsell. May ¶ 27, Exh. 3. Doug May is currently employed with Advantus as the Vice President of Sales of the OttLite business unit, and Mr. Forsell is employed by Advantus for the benefit of the OttLite business unit. May ¶ 5. In the November 22, 2023 email, Egan sends a proposed email that Egan says he will

send to the Retailer on December 4, 2023 if Advantus fails to acquiesce to his demand to pay the $18,000 that Egan claims OttLite owes him. Carpenter ¶ 18; May ¶ 27. In the draft email to the Retailer, Egan discloses: (a) the capabilities of the factories from whom OttLite, Inc. (now Advantus) procured certain products it sold to the Retailer; (b) the purchase price per unit that OttLite, Inc. (now Advantus) pays the factory for the given product versus what OttLite, Inc. (now Advantus) charges the Retailer per unit for the product; and (c) how Egan will help the Retailer bypass Advantus and buy these products direct from the manufacturer. Carpenter ¶ 19; May ¶ 28.

Sending the threatened email does not benefit Egan, it would just inflict damage on Advantus' relationships with the Retailer, which is why Egan threatens to send the email unless Advantus sends him money by December 4, 2023. If there was a benefit to be had he would have just pursued the benefit to be had. Instead, Egan is trying to extort money from Advantus for the damage that he knows such an email would do to Advantus. Although the demanded ransom is relatively modest, Advantus fears that if paid, more demands would follow and that Egan might disclose the information in any event.

**D.    Advantus Will Suffer Irreparable Harm if Egan Discloses the Pricing or Factory Information**

If Egan discloses the Pricing or Factory Information to Advantus' customers as threatened, Advantus would be at substantial risk of losing all of the sales to

8

the Retailer as the Retailer could directly source the product from the factory and bypass Advantus entirely. Carpenter ¶ 20. Indeed, this is the exact harm that Egan explicitly says will occur if his demands are not met by December 4, 2023. Carpenter ¶ 19. At a minimum, the Retailer could use this information to either get another competitor of Advantus to undercut Advantus, or demand price concessions from Advantus severely eroding the margins Advantus receives on the products. Carpenter ¶ 20. Because the Retailer is by far the biggest purchaser of the OttLite products, the damage that could follow from this disclosure would almost certainly eviscerate the value of the assets for which Advantus and its subsidiary just paid millions of dollars to a combination of the creditors of OttLite, Inc., and to OttLite, Inc. Carpenter ¶ 20.

### IV. MEMORANDUM OF LAW

**A.    Legal Standard**

A preliminary injunction is appropriate where the plaintiff establishes "(1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1270-71 (11th Cir. 2020) (affirming district court's grant of preliminary injunction).

**B.     Advantus is Entitled to a Temporary Restraining Order and Preliminary Injunctive Relief to Prevent Egan from Misappropriating Advantus' Trade Secrets and Confidential Information**

**1.     The Middle District of Florida Has Previously Granted Advantus' Request for Injunctive Relief on Substantially the Same Facts**

In December of 2010, Advantus filed a Complaint for Temporary and Permanent Injunction against an individual named Gerald Piccolo, and his company, Piccolo, Inc., in the Middle District of Florida, Case No. 3:10-cv-01092-MMH-JK (the "Piccolo Suit"). The Piccolo Suit involved facts almost identical to the present action, to wit: Advantus engaged in an asset acquisition substantially similar to its acquisition of certain of OttLite, Inc.'s assets, and Piccolo, who previously provided services for the acquired company and then Advantus for a short period of time, subsequently attempted to extort money from Advantus and threatened to disclose Advantus' pricing information if Advantus did not pay him hush money. The pricing information Piccolo threatened to disclose is the same type of Pricing Information Egan threatens to disclose in this action.

In the Piccolo Suit, Advantus sought temporary, preliminary, and permanent injunctive relief to prevent Piccolo from disclosing its confidential information. This Court granted Advantus' request, and entered a Temporary Restraining Order against Piccolo (the "TRO"), a true and correct copy of which is attached as **Exhibit A**. In the TRO, this Court found that (1) Advantus established a substantial likelihood of success on the merits on its claim for tortious

interference and violation of the Florida Uniform Trade Secrets Act; (2) disclosure of the pricing information would cause immediate and irreparable harm to Advantus; (3) notice to Piccolo was not required prior to issuance of the TRO due to the imminent threat of irreparable injury; (4) the threatened injury to Advantus outweighed any potential harm to Piccolo, of which the court could discern none; and (5) an entry of an injunction would serve the public interest. *See* Exh A.

### 2.    Advantus Has a Substantial Likelihood of Success on the Merits

Advantus asserts two causes of action for injunctive relief, to wit: Count I for violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*. (the "DTSA"), and Count II for tortious interference with advantageous business relationships. Advantus has a substantial likelihood of success on the merits of both claims.

### a.    Violation of the DTSA

The DTSA specifically provides for injunctive relief "to prevent any actual *or threatened* misappropriation." 18 U.S.C. § 1836(b)(3)(A)(i) (emphasis added). To enjoin a threatened misappropriation under the DTSA, a plaintiff must establish the existence of a trade secret and the threatened misappropriation of that trade secret, as those terms are defined in the DTSA. *Id*.; *see also Hayes Healthcare Services, LLC v. Meacham*, No. 19-60113-CIV-COHN/SELTZER, 2019 WL 2637053 (S.D. Fla. Feb. 1, 2019) (granting preliminary injunction in part, finding plaintiff established a confidential database constituted a trade secret and defendant intended to

misappropriate the trade secrets because he surreptitiously retained them with intent to use them for his personal benefit).

### 1. The Pricing and Factory Information are Trade Secrets

The DTSA defines a trade secret as:

[A]ll forms and types of financial, business, … [or] economic, …. information, … whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). Here, the Pricing and Factory Information constitute trade secrets. The prices Advantus charges its customers for its products have been established through years of negotiations between OttLite, Inc. and its customers, and were derived at great expense. May ¶ 10. Similarly, OttLite, Inc. developed relationships with the factories it used to manufacture lighting products over the course of several years and at great expense, including negotiations regarding the cost of manufacturing. May ¶ 10. Advantus acquired these assets from OttLite, Inc. as part of a transaction in which Advantus paid several million dollars. Carpenter ¶ 20. The Pricing and Factory Information derive independent economic value

12

because they are not generally known to others who could obtain economic value from its disclosure; here, Advantus' customers and competitors. May ¶ 9; Carpenter ¶¶ 9-10.

Egan knows the Pricing and Factory Information have independent economic value. The very threat to disclose this information if he is not paid shows that Egan recognizes that the Pricing and Factory Information have value in having been and continuing to be kept confidential, which only further demonstrates the valuable, sensitive, and secret nature of the Pricing and Factory Information. Indeed, this type of confidential information is routinely found to constitute a trade secret. *See VAS Aero Services, LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1359 (S.D. Fla. 2012) (granting preliminary injunction under Florida's Uniform Trade Secret Act, holding customer agreement that included pricing formulas and pricing terms was a trade secret because, *inter alia*, if disseminated, a competitor could undercut the plaintiff's prices); *Fadalla v. Life Automotive Products, Inc.*, 258 F.R.D. 501 (M.D. Fla. 2007) (finding "identity of its customers and suppliers, the products it currently markets or sells to such customers and supplies, its marketing strategies and sales figures" to be protected trade secrets); *see also Marlite, Inc. v. Eckenrod*, No. 09-22607-CIV, 2011 WL 39130 (S.D. Fla. Jan 5, 2011) (stating "pricing information such as expenses, costs, profit margins, and run rates

have been held to constitute trade secrets," and finding sufficient evidence that information as to products customers bought and prices paid, were trade secrets).

If the Pricing or Factory Information were known or released to third parties, including customers or competitors, then the value of the Pricing and Factory Information would be obviated. Competitors and customers would be able to use the Pricing and Factory Information to undercut Advantus, and Advantus would be forced to reduce prices for current and potential customers despite existing market rates. Disclosure is also likely to cause Advantus to lose the customer relationships, as the customers themselves could source the products directly from the factories or get Advantus' competitors to do so at great economic harm to Advantus. Carpenter ¶ 20; May ¶ 8.

Additionally, both OttLite, Inc. and Advantus undertook and presently take reasonable steps to safeguard the Pricing and Factory Information. The information was and is shared only on a "need to know" basis, and maintained on password-protected systems. Carpenter ¶ 11; May ¶ 12. Further, both OttLite, Inc. and Advantus require personnel with access to the Pricing and Factory Information to enter confidentiality and non-disclosure agreements, which Egan did with OttLite, Inc., and National Account Managers are subject to company policies that require them to maintain the confidentiality of all OttLite, Inc. information. May ¶ 12; Carpenter ¶ 12.

OttLite, Inc. shared the Factory and Pricing Information with Egan because he needed it to carry out his job duties on behalf of OttLite, Inc. May ¶ 15. OttLite, Inc. never authorized Egan to share the Pricing Information with any other customers other than particular customers to which the particular prices applied, or to share the Pricing Information with OttLite, Inc.'s competitors. May ¶ 15. OttLite, Inc. likewise never authorized Egan to share the Factory Information among customers or with competitors. May ¶ 15. OttLite, Inc. would not have provided the Factory or Pricing Information to Egan if he were going to share it among OttLite's customers or with OttLite's competitors. May ¶ 15. Finally, OttLite and Advantus' customers mandate that manufacturer's employees and representatives agree to keep this Pricing Information confidential. May ¶ **9**.

### 2. Egan Threatens to Misappropriate Advantus' Trade Secrets

As to the second element, Egan is clearly threatening to misappropriate the Pricing and Factory Information. Threatened misappropriation occurs upon a threat of "disclosure or use of a trade secret of another without express or implied by a person who . . . knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret[.]" 18 U.S.C. § 1839(5).

Here, Egan has stated a threat that he will disclose the Factory and Pricing Information to customers on December 4, 2023 unless Advantus pays a debt Egan

claims OttLite, Inc. owes. Egan further has refused to return his OttLite, Inc. laptop, which contains trade secret and confidential information, including the Factory and Pricing Information. May ¶¶ 21, 23. Egan knows he acquired the Pricing and Factory Information under circumstances giving rise to a duty to maintain its secrecy. Indeed, Egan's express written demand for money in exchange for his not disclosing the Pricing and Factory Information to Advantus' customer demonstrates that Egan knows the information is confidential and derives great value in being kept secret. That is, Egan is attempting to capitalize on the value of this information being kept secret and the harm he knows Advantus will suffer if he discloses it to Advantus' customer.

### b.    Tortious Interference with Business Relationships

The elements of a claim for tortious interference with a business relationship are "(a) the existence of a business relationship, not necessarily evidenced by an enforceable contract, (b) defendant's knowledge of that relationship, (c) defendant's intentional and unjustified interference with the relationship, and (d) damage to the plaintiff as a result of the breach of the relationship." *See, e.g., McCurdy v. Collis,* 508 So.2d 380, 383 (Fla. 1st DCA 1987). A party may seek injunctive relief to prevent threatened tortious interference with its business relationships before the tortious conduct and irreparable harm occurs. *See Heavener, Ogier Svcs., Inc. v. R.W. Fla. Region, Inc.,* 418 So. 2d 1074, 1075 (Fla. 5th

16

DCA 1982) (affirming trial court's entry of temporary injunction, noting "[t]emporary injunctions have been recognized as a viable form of relief in a suit for tortious interference with a contract."); *Paul's Drugs, Inc. v. Southern Bell Tel. & Tel. Co.,* 175 So. 2d 203, 205 (1965) (injunctive relief is appropriate in tortious interference cases); *see also SMS Audio, LLC v. Belson*, No. 9:16-cv-81308-MIDDLEBROOKS, 2016 WL 8739764 (S.D. Fla. Aug. 16, 2016) (granting preliminary injunction in tortious interference claim, noting preliminary injunctions have been recognized as relief for a tortious interference claim).

In suits to enjoin threatened tortious interference, "irreparable harm is sometimes assumed." *Heavener,* 418 So.2d at 1075; *Unistar Corp. v. Child,* 415 So. 2d 733, 734 (Fla. 3d DCA 1982) (reversing trial court's denial of preliminary injunction, holding "[e]ven if positive proof of an injury did not appear from the record, such irreparable harm could be presumed and need not be alleged or proved in a case involving wrongful interference with a business relationship."); *see also FC Funding LLC v. MCJ Auto Sales of Central Florida, Inc.*, No. 6:12-cv-1713-Orl-31KRS, 2012 WL 12883898, at *3 (M.D. Fla. Dec. 19, 2012) (granting motion for preliminary injunction, finding irreparable harm is presumed under Florida law for claim for tortious interference with business and contractual relationship).

Here, Advantus has a substantial likelihood of prevailing on the merits of its claim to enjoin Egan's threatened tortious interference with its business

relationships. First, Advantus has relationships with a number of customers throughout the nation that buy the types of products for which Egan has knowledge of Advantus' Pricing and Factory Information. Carpenter ¶ 21; May ¶ 18. Egan, as a National Account Manager for OttLite, Inc. for approximately four years, had actual knowledge of these OttLite customer relationships (now owned by Advantus), including, but not limited to, the customers Egan serviced. May ¶ 18. In his November 22, 2023 email, Egan identifies by name one of Advantus' business relationships with such a customer, i.e., the Retailer, to include identifying the decision makers at the customer to whom he intends to direct his threatened disclosure. Carpenter ¶ 19; May ¶ 27. Egan also stated in his email that he would disclose the Factory and Pricing Information to other Advantus customers of OttLite business unit products if his demand was not met. Carpenter ¶ 19; May ¶ 27.

Second, Egan's intent to interfere could not be clearer. On September 22, 2023, Egan initially refused to return his OttLite, Inc. laptop, which contains OttLite's trade secret information. May ¶ 21. Egan followed this verbal refusal with written communications in which he continued to attempt to use his refusal to return the laptop as leverage to force Advantus to pay him, and stated that "one way or another" he will get the money he claims is owed to him. May ¶ 23; Carpenter ¶ 17. Egan then sent the November 22, 2023 email in which he

18

demanded compensation in exchange for him agreeing not to harm Advantus by disclosing the Pricing and Factory Information. Carpenter ¶ 19; May ¶ 27.

Third, Egan's threatened interference is unjustified. The information at issue is confidential, proprietary information that was provided to Egan in confidence, for the limited purposes of benefiting OttLite, Inc. in its relationships with its customers, and it was provided to him in his capacity as a trusted fiduciary, subject to contractual restrictions on disclosure of the information. May ¶ 15. The relationship of principal and agent is widely recognized as a fiduciary relationship of confidence and trust. *See, e.g., Seoul Broad. Sys. Intern., Inc. v. Ladies Prof/ Golf Ass'n,* 6:09-CV-2050ORL19DAB, 2010 WL2035137, at *6 (M.D. Fla. 2010) (fiduciary duties may be implied and include the relationship of principal/agent).

The disclosure of confidential information by a fiduciary to third parties is unlawful and therefore unjustified. *Dotolo v. Schouten,* 426 So. 2d 1013, 1015 (Fla. 2d DCA 1983) (reversing trial court's denial of preliminary injunction, holding that the existence of a confidential relationship gives rise to an implied legal obligation not to use or disclose trade secrets). This is true whether or not the information qualifies as a trade secret. *Biodynamic Tech., Inc. v. Chattanooga Corp.,* 644 F. Supp. 607, 610 (S.D. Fla. 1986) (when confidential information is obtained through a fiduciary relationship, whether the information qualifies as a trade secret is immaterial). The fact that the fiduciary no longer acts on behalf of the principal

does not terminate the fiduciary's duty to keep confidential information a secret. *See, e.g., Life Mktg. of Fla., Inc. v. A.JG. Life Ins. Co.,* 588 So. 2d 663, 665 (Fla. 5th DCA 1991) ("[t]he duty of an agent to be faithful to his principal is inviolable and extends beyond the termination of the parties' relationship."). Further, as the Pricing and Factory Information constitute trade secrets, the threatened misappropriation is unlawful and cannot legally be justified. *See* 18 U.S.C. § 1836.

Finally, Egan's intent in disclosure would be malicious and solely to cause Advantus harm. He specifies in his threats how much net revenue Advantus would lose annually if the retail customer went to the factory directly and bypassed Advantus. Carpenter ¶ 19; May ¶ 27. Egan would not get this net revenue, but Advantus would lose it. The threat is explicitly to cause Advantus economic harm if Egan's demands are not met.

This case is not about Egan's entitlement to unpaid bonus money. Egan has a judgment against OttLite, Inc. and can freely pursue his legal state court remedies to enforce and collect his judgment from whomever may have legal responsibility for that debt. Instead, Egan wishes to bypass the courthouse door and extort Advantus into paying him the bonus money he claims he is owed from OttLite, Inc. without Advantus having any due process under the threat of his attempting to destroy Advantus' multi-million dollar relationships with certain customers. There is no nuance to Egan's threat. This is a simple "hold up," and

what Egan is doing constitutes a felony in Florida. *See* Fla. Stat. § 836.05 ("Whoever . . . maliciously threatens . . . an injury to the person, property or reputation of another . . . or to expose any secret affecting another . . . with intent thereby to extort money or any pecuniary advantage whatsoever. . . commits a felony of the second degree"). Egan's threatened disclosure risks significant harm to Advantus, while it costs Egan nothing to keep secret that which he has maintained secret for several years.

### 3.   Advantus Will Suffer Irreparable Harm if a Temporary Restraining Order and Preliminary Injunction are Not Granted

Egan's disclosure of the Price and Factory Information is substantially likely to cause irreparable harm. Indeed, all Egan has to do is press "send" on an email he has already drafted, and as soon as Egan discloses the Pricing and Factory Information, the harm will be irreparable. Once customers know the information, there is no way to "un-ring the bell." *Southeast Mechanical Services, Inc. v. Brody*, No. 8:08-CV-1151-T-30EAJ, 2008 WL 4613046, at *15 (M.D. Fla. Oct. 15, 2008) (granting preliminary injunction in part, recognizing that once confidential information was used to solicit customers there was no way customers could be "unsolicited"). Egan has explicitly said that he will do so unless his demands are met by December 4, 2023.

The harm to Advantus will be extremely difficult to calculate and has a substantial risk of devastating a significant segment of Advantus' business.

21

Carpenter ¶¶ 20-21. If Egan discloses Advantus' Pricing and Factory Information to customers as he has threatened, it will cause irreparable harm to certain of Advantus' business relationships with its customers, as Advantus' pricing structure and variations in price among its customers, if known, will allow them to undercut Advantus or bypass Advantus entirely. Carpenter ¶¶ 20-21. Such damaged relationships could lead to significant loss of revenues for Advantus. Carpenter ¶¶ 20-21.

With regard to the specific customer (the Retailer) to whom Egan intends to disclose the Price and Factory Information, Advantus already had long-standing business relationships with that customer for product lines other than those it recently purchased from OttLite. Carpenter ¶ 21. Thus, disclosure will not only affect Advantus' relationships and goodwill with this customer as they pertain to the product lines Advantus purchased from OttLite, Inc., but also as to many other products Advantus sells and has sold to the customer for many years. Carpenter ¶ 21. Thus, once the Pricing or Factory Information is disclosed, the harm will be irreparable and potentially devastating.

This is precisely why immediate injunctive relief is appropriate and necessary. *See East v. Aqua Gaming, Inc.*, 805 So. 2d 932, 935 (Fla. 2d DCA 2001) (finding irreparable injury when former employee "intended to destroy" former employer's business by obtaining its "vendor names, telephone numbers,

addresses, and contact persons" in an effort to "'jumpstart' his business by taking the heart out of [the employer's] business."); *Southeastern Mech.*, 2008 WL 4613046 at *15 (injunctive relief is needed "when employers are threatened by conduct of former employees that would 'irreversibly alter the status quo.'") (citation omitted). Moreover, in claims brought to enjoin tortious interference, "it is not necessary that irreparable injury already be sustained in order for a court of equity to properly exercise its jurisdiction in granting injunctive relief, but only that a showing be made that there is a reasonable probability... that such damage will be sustained." *Paul's Drugs,* 175 So. 2d at 206. Further, when a party intends to misappropriate trade secrets, irreparable harm may be presumed. *Southeastern Mech.,* 2008 WL 4613046 at *15 ("irreparable harm is presumed when a party appropriates or intends to appropriate trade secrets" and "in cases involving wrongful interference with business relationships."). The loss of good will and customer relationships through such disclosure is an irreparable injury and is difficult to measure. *Id.*

### 4.    The Balance of Harms Favor Advantus, as the Threatened Harm to Advantus Outweighs Any Harm to Egan

While Advantus stands to lose multi-million-dollar relationships with its customers, damage to its goodwill, and misappropriation and loss of value of its trade secrets and the assets it purchased from OttLite, Inc., Egan will suffer <u>no harm</u> if he is enjoined from disclosing the Pricing and Factory Information. He

remains free to pursue his remedies to collect his default final judgment against OttLite, Inc. from whomever he wishes consistent with whatever legal rights he may have. Further nothing within the requested injunction interferes with Egan's ability to compete with Advantus so long as he does not directly or indirectly use, misappropriate, or disclose the Factory or Pricing Information.

## 5. A Temporary Restraining Order and Preliminary Injunction Will Protect the Status Quo and Notice and Hearing is Impractical

Egan has demanded $18,000 by December 4, 2023, or he will disclose the Pricing and Factory Information. Indeed, he has already sent Advantus a draft of the email he threatens to send to Advantus' customer on December 4, 2023 if his demands are not met. The threat of injury to Advantus is direct and imminent. If Egan is provided advance notice of legal action, he may carry out his threat and cause the irreparable harm—simply by pressing "send"—before he can be ordered not to. Once he has disclosed the secret Pricing and Factory Information, the damage is done. Accordingly, an immediate temporary restraining order is appropriate to prevent Egan's disclosure until such time as this Court can conduct a hearing on the motion for preliminary injunction.

## 6. An Injunction Will Not Disserve the Public Interest

Injunctive relief will not disserve the public interest. This is a private dispute regarding proprietary, confidential and trade secret information that is not generally known to the public. Protection of such information is in the public

interest as it prevents unjustified harm to a manufacturer's business.

**7.    Appropriate Bond for Injunction**

With regard to the appropriate security for the relief Advantus seeks, one looks to the potential damage to the enjoined party if the injunction is wrongfully entered. *See* Fed. R. Civ. P. 65. Here, Egan will suffer no damage by keeping confidential that which he has kept confidential for approximately four years. Nonetheless, as Egan apparently values keeping this information secret at $18,000, a bond of $18,000 should adequately compensate Egan for any potential damages.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs have made a showing sufficient for entry of a temporary restraining order and/or a preliminary injunction and respectfully request the entry of a restraining order and/or preliminary injunction against Egan as set forth in the proposed order attached hereto as **Exhibit B**.

**SMITH, GAMBRELL & RUSSELL, LLP**

*/s/ Nicole L. Kalkines*
ALAN S. WACHS (Lead Counsel)
Florida Bar No.: 980160
awachs@sgrlaw.com
tgreene@sgrlaw.com
dhsmith@sgrlaw.com
NICOLE L. KALKINES
Florida Bar No. 1003293
nkalkines@sgrlaw.com
dcote@sgrlaw.com
50 N. Laura Street, Suite 2600

Jacksonville, Florida 32202
Tel.: (904) 598-6110
Fax: (904) 598-6210

JASON P. STEARNS
Florida Bar No. 59550
jstearns@sgrlaw.com
ckitchell@sgrlaw.com
**SMITH GAMBRELL & RUSSELL, LLP**
201 N. Franklin Street, Suite 3550
Tampa, FL  33602
Tel.: (813) 488-2926
Fax: (813) 488-2960

*Attorneys for Plaintiffs*